Lines, 16-3668. Good morning, your honors. If it may please the court, I am James Krausis and I represent AXA Corporate Solutions Assurance in this matter. Your honor, one of the main issues in this case... How much time do you want to reserve? Sorry? Oh, I'm sorry, yes, I'm going to give you three minutes. Three minutes is granted. Thank you, your honor. One of the major issues in this case is that we're dealing with where and when a CARMAC claim can be waived, where the waiver is not in a direct agreement between the cargo owner and the carrier, but in another agreement. In this case, we're dealing with a transportation agreement that Sanofi had agreed to with the trucker. So the question I have for you is if we give 14-101-B1 its plain meaning, that goes directly to the point that you're raising, what does, quote, transportation provided under the contract, close quote, mean? My reading of that is that it goes to the transportation provided by the agreement. In other words, we've got a situation here where a transportation agreement was agreed to. It's basically a service agreement. It is not the actual contract of carriage. It doesn't specify a particular cargo going from point A to point B, such as in a bill of lading. It is an agreement that we, Sanofi, as the manufacturer and seller of the goods, has allocated certain lines to carriers. And in this case, we've got Great American Lines, who has bid on and was granted the right to carry certain cargoes under certain of their routes. And this is a regular route. My question goes to that specific language that I just read to you. The question is, does it cover the entire transportation chain, or does it only cover as between the shipper and the carrier? That's the real question. I believe that if it's a proper waiver, that it covers the entire transportation chain. So if it covers the entire transportation chain, and the transportation contract between GAL and Sanofi has a waiver, why wouldn't that waiver apply to everyone in the transportation chain? Because the contract was inartfully drafted and limits the benefits and terms only to the signatories. So that means you could have a situation. So what you're saying is, this situation creates the following anomaly. The shipper and the carrier have waived the CARMAC amendment as their behalf in the transportation chain can invoke the CARMAC amendment. Yes, because it is a very bad agreement. So you're going to have, oh, okay, we're going to have a limitation of liability here in the following ways as we set forth in the agreement. But over here, there won't be, because the CARMAC amendment is going to affect these rights. So you can have relationships between the shipper and or the carrier and others that are going to be governed by the CARMAC amendment, but as between themselves, they've waived it. That's what you're saying is the result of this. Well, we're dealing with a very straightforward motor carriage arrangement. If it was straightforward, you wouldn't be here. What I mean to say is, unlike in Norfolk Southern, where you dealt with an intermodal where you had various types of carriage, various types of parties being involved in the transportation scheme, here you have just the seller, the consignee, and the trucker. But as Judge Greenway says, what you're arguing is basically there's mutually exclusive liability regimes for depending on who you look at. That's really untenable, isn't it? Isn't that kind of inconsistent with the CARMAC Act generally? Well, no, because if you look at what we have here, you've got an agreement. If the waiver applies, which we say it doesn't because it's a very bad agreement, but if the waiver applies, then you have a state court right of action. It's not going to change between the parties. It's either going to be a waiver, because you start out with the premise that it's a CARMAC claim. It's a CARMAC carriage. The parties have to make an express agreement. But don't you agree, though, that between at least the two signatories, there's a waiver? You're saying the waiver doesn't extend to anybody else. Yes, I do say that. Okay. Yes, I do say that. And in this case, Santa Fe, of course, has no rights to the cargo once it's loaded on a truck because of the terms of sale. The only person that has rights to the cargo under the sales agreement is the customer. So they're not even involved, Santa Fe, with whether they're going to make a claim because they have no right of claim. Didn't the Kirby Supreme Court case, now granted it's not dealing with CARMAC exactly, but didn't that deal with some of what you're talking about, the practical difficulties requiring carriers to negotiate separately with each party and might have an interest in it? How does Kirby control, doesn't it control here? Actually, it doesn't because it's distinguishable. In that case, there was no questionable language, which in the agreement giving certain rights, restricted it just to the signatories. It was a bill of lading agreement. And the party who then was affected by the agreement was subject to those terms as they should be. In this case, you've got an agreement which in and of itself is horrendous as far as wiping away those terms and conditions unless you're in a signatory. And the other thing that creates a problem here is the district court in the one hand enforced the waiver clause against McKesson, and then the other hand refused to allow them to pursue a contract claim under that same agreement. Now enforcing the, it is only binding on the signatory's wording, which to me is very inequitable. But on top of all of that, he forgot that there was a bill of lading. He ignored the fact that the actual contract of carriage governance, that transportation agreement is nothing more than a service agreement. The actual bill of lading that was issued for this cargo in which McKesson was named as the consignee, that he had a right to enforce that. So you're saying that they needed to repeat the waiver that was stated in the transportation agreement in the bill of lading for us to say that it's applicable throughout the transportation chain? What they should have said is that they should have left out that language that the terms and conditions of this contract are only binding on the signatories. They should have said that the terms and conditions of this agreement are incorporated in and also binding upon any party affected by the transportation arrangement. But they didn't say that. Apparently they weren't aware of how the transportation was going to go forward, particularly the involvement of a third party who was not a signatory to the agreement. It is a very bad agreement. I thought in your motion for summary judgment, you made a concession that McKesson's rights against GAL are pursuant to the transportation contract. Doesn't that undermine your claim here on appeal that the transportation contract waives CARMAC? Aren't those positions in conflict? No. What I argued down below is that we were intended beneficiaries of the agreement. That Sanofi, of course... If you're intended beneficiary, then that would mean that you would argue that the waiver applies because that's what the parties agreed to. And that would be consistent with your 14101B1, which is that the agreement, the waiver, would apply throughout the transportation chain because the language there was transportation provided under the contract. So I ask the question again, isn't that now inconsistent with the position that you're taking now, which is that the waiver only applies to the shipper and the carrier on the one hand and that everywhere else down the transportation chain, the waiver doesn't apply to? Well, I had to adjust my argument because of what the court held below. But even if we take it back to step one, I would still agree, yeah, we're subject to the waiver. And because there is a waiver, we have to then pursue our claim as a contract state claim. But the court below refused to grant us any recognition of having a contract with the carrier, which to me was a little bit... Did you argue to the trial court that the premise for your contract claim was the bill of lading? I argued that there was a bill of lading, that we were named constant, yes. I also argued that it expressly required them to make delivery to us. And that the MVP, the other carrier defendant, had endorsed that agreement, acknowledging it as a receipt for the carriage of the goods. And so the intermodal, excuse me, the trucker's manifest is in fact the CARM Act contract of carriage, which even if you waive it, we still have a right to enforce. The lower court's decision, unfortunately... And how did that work practically? If up the chain, everybody agrees to waive it, but down the chain, everybody can seek to enforce it? Well, that's the problem with the way the agreement was written, Your Honor. Ordinarily, you don't have that limiting language. You have a straightforward, we would agree to waive, and then a bill of lading is issued, and all the people who act under that bill of lading are now subject to a waiver. But you could have really inequitable results from that, right? You could have limitations of liability between the two, quote, unquote, big players, and everywhere else down the chain, you know, CARM Act applies, and they have greater liability than the people who are really controlling the transaction. That wouldn't seem to make sense. Well, we don't have a limitation of liability issue here, because the court said that that applied to us. But I understand what Your Honor is getting at, that you could have... And this is the argument that was made by my opponent on reconsideration, that you've got an implicit two types of liability schemes here, because it's either going to be waived or it's not, and you may have different people. No, we don't have that complex situation here. We have a straightforward CARM Act carriage, which either was or wasn't waived. And that in turn makes us... We're entitled to pursue the carrier under our contract of carriage. The court didn't recognize a transportation agreement as a contract of carriage for us. He ignored the bill of lading, even though in his first decision, he actually recognized it in a footnote that this is the bill of lading. And so we're put into a very difficult situation where we have cargo being carried by a carrier, but we don't have a contract of carriage. See, I'm getting a little confused here. Maybe you can help me out. If we find that there is a valid CARM Act claim waiver, so you don't have liability under the CARM Act amendment, is it your position then that you have a breach of contract claim under the contract principle? Yes. What is the evidence of causation on the whole pilot issue? Yes. We had an unfortunate situation. There's no video. There's no security. There's no witnesses. What we do have are what is typically seen in CSI and so forth, the forensics. We have a certain way. Forensic, unlike CSI, which I never watch, didn't lead you to an answer necessarily, right, as to who's responsible. In the absence of that, how can you create the genuine issue that would then require trial to resolve? With all due respect, our people did know that this was being perpetrated by a group, a specific group, who targeted these vehicles as they leave the premises. That's why we told them not to stop within the first 150 miles. Is that evidence somewhere for us to discern? Well, it's the pieces of the debris that was left behind. It's the manner in which they broke it in. It's the modus operandi of attacking this truck. So you've got 404B, that somebody specifically, I presume that's your argument. Where is this leading? I mean, I understand it was a theft. There was glass on the ground, etc. But you need more than that to claim that it was a negligence of a pilot, don't you? Yeah, and under Georgia law, I mean, doesn't a pilot need superior knowledge? Where does that come from? Well, the court said that there was factual issues with respect to that and the foreseeability. He said he couldn't address that because of all the facts that were before him, suggesting on one hand in our position that they had superior knowledge, and then in their position, on the other hand, he said he went to the third step, which is what Your Honor is referring to, is the lack of any evidence so as to even approach the causation analysis. Well, that's apparently what Georgia law, which I was not familiar with before this case, what Georgia law requires. So help us, because I speak only for myself. I'm confident my colleague knows exactly what you're thinking about. But help us now. I am in the same position as for Georgia law, Your Honor. And my position was that we had sufficient earmarks of how this occurred and the type of people that would have done it. And that would have been aiding the finder of fact with the expert testimony to explain how they did this and how these pieces of evidence show how they did it and how therefore the various protocols for security would have prevented them from either carrying it out or deterred them from doing so. So it sounds like you're conceding that you don't meet Georgia law. Well, what I'm saying is I think we needed to look at it from the point of view of the finder of expert witnesses who could then put all these items of fact in perspective for the jury to make the decision. I don't think it is something that should have been decided on summary judgment. There's just too many factual issues. They're saying we don't know who did it. Well, we certainly know it was a group. And we know that because of the way the crime was committed. It wasn't a one-on-one person, you know, crime of opportunity. We also know that it happened very quickly once he left the truck. That suggests monitoring by a crew that helps these people steal it. And then what I'm saying is all those little pieces of evidence should be considered. May it please the court. My name is Jeffrey Cohen on behalf of Great American Lines. Am I putting the microphone in front of you? Sure. Thank you. May it please the court. My name is Jeffrey Cohen on behalf of Great American Lines and MVP Leasing. So why don't we start with the question that I asked your adversary and that is with regard to the language that I read from 14-101-B-1. Does transportation provided under the contract apply only to the shipper and carrier or does it apply along or throughout the transportation chain? Thank you, your honor. That's central issue to the case, the interpretation of the statute. And that language, for it to be effectual, to be consistent with the transportation industry in the United States of America and with past precedent, Kirby included, as well as the Carmack amendment, which it's waiving, that has to apply to all of the transportation involved with respect to the move. And that would include the shipper, the consignee, any intermediaries, any intermediate carriers in transportation transactions. They're never really simple. You never really know who the owner of the freight is and the owner of the freight also. You mean at a point in time? At the point in time, the contract is struck for moving the freight from point A to point B. The ship, the carrier does not know necessarily who owns the freight and there could be other parties involved in the chain. So to answer your question, that language, the transportation provided under the contract is global to that transportation transaction. Why wouldn't the owner of the freight always be an intended beneficiary of the contract so as to have breach of contract claims? The owner of the freight, the way the statute is set up, it provides for an acknowledgement of a waiver from two parties, identified as the carrier and the shipper. Those are the two parties that are essential in forming this contract. Now, with respect to the owner of the freight being an intended third-party beneficiary of that contract, that can't be read into the contract. That's contract law. Once we move back into the application of contract, once Carmack is and we have to see who the intended beneficiaries are with respect to this case. Now, in this instance, the contract was drafted by Sanofi and the contract that was drafted by Sanofi excluded third-party beneficiaries. Essentially, it applies solely to the parties to the contract. So really what happened is globally, McKesson delegated its responsibility for arranging for transportation to Sanofi, to the shipper. That was an economic choice. It's not terribly unusual, right? It's a choice. It's not always one way or always another way. So no, it's not terribly unusual for a consignee to delegate responsibility for arrangement to transportation to the shipper. But what is a bit unusual here is the disconnect between probably what McKesson wanted and what Sanofi did to them. When Sanofi entered into the provision in their contract that said it solely applies to the parties to the contract with respect to the terms of that contract. But the problem is, and this was a nuanced item in an addendum to the distribution agreement between Sanofi and McKesson. In that addendum, and this is the most interesting part of the case, there was a term, FOB origin, free on board origin. Now that term transferred title from the point the shipment is at the dock. Once it gets on that truck, McKesson owns it. Now, if you see, that's a little unusual, right? That is unusual. That should not have happened. And that was a mistake made between McKesson and Sanofi. Really, Sanofi as the limited agent of McKesson in making these transportation arrangements shouldn't have hung out their customer to dry by not allowing them the benefit of the transportation contract under which McKesson's freight was being moved. Now, AXA, the international insurance conglomerate, should have evaluated the underlying contracts and understood who they were insuring. So the equitable outcome was footnoted by the judge, but the equities, although in this case, McKesson and with zero, it's because of the arrangements. McKesson didn't have to delegate that responsibility to Sanofi. They could have hired their own carrier. McKesson didn't have to do an FOB origin situation. They could have said, no, I want it to be FOB destination, and I want ownership of the freight to reside with Sanofi in transit. After all, you're arranging the transportation. Let you be on the hook for damages associated with the move. In pharmaceuticals, the transportation item is the lowest thing on the list they're thinking about. So really, I don't think this was looked at properly by the law department. They have a law department, and they have a transportation department. There was a disconnect in their contracting, which leaves them in their spot where they are now. The law, with respect to the 14-101 waiver, covers transportation, everybody involved, and as your honor's questioning presented, if this was not to be applied globally to all stakeholders, if you will, in the transportation chain, the results would be inequitable. It would actually upend transportation in the country, because carriers really never know who owns the freight when they enter into that contract. Should we be applying the Kirby decision? The Kirby decision, yes. Essentially, the Kirby decision is what should be applied. The Kirby decision has a great analysis of the industry, and what happens when you have inconsistent legal frameworks that are put upon a transportation transaction. So Kirby is an excellent roadmap. In the Kirby decision, it dealt with a limitation of liability. Here, it deals with the application of the waiver, but they are congruous in the logic, which is to essentially provide for a uniformity, and more importantly, a predictability for carriers and shippers when making contractual arrangements. Let me ask you this question. Within the transportation contract, there seems to be inconsistent language. We talked about transportation provided under the contract, which seems to say that throughout the transportation chain, the CARMAC waiver would contract shall be binding upon and in order to the benefit of the parties hereto only. How are we to resolve that inconsistency? Yes. The way to resolve that inconsistency, Your Honor, or what appears to be an inconsistency is... You mean it's not? Well, I think the issues speak past one another. You start with a statute. If you start with the statute, and the statute provides for steps to waiver, the steps are check the box, shipper, carrier made an agreement. They put it in writing. It addressed waiver. The next thing you look at here is, well, what does that do? That eliminates CARMAC from the computation. It eliminates CARMAC from the liability regimen at that point, because it addresses the entire transportation. Now, if you didn't have the statute, let's say you didn't have the statute, and you had that language, you might have... If this language was different, if this language said you must have an agreement with the shipper, carrier, and the beneficial owner of the goods, or and the consignee, or something like that, it doesn't. If it did, you might have some issues, but the statute prevails over this language. Also, this language is not contained within the waiver section. In other words, it doesn't exclude consignees from the waiver language. It essentially says that only the parties to the contract can enforce the contract, so you can't have another pharmaceutical company trying to assert rights under the contract for movement of freight. What you have is the statute, and the statute, and the language of the statute prevail in that apparent disconnect. Yeah, with respect to CARMAC waiver, what about the bill of lading? Why can't the bill of lading form the premise for a breach of contract claim? I'm glad you raised that, Your Honor. With respect to the bill of lading argument, it really should be on question that the bill of lading argument, as we're calling it, it's really not a bill of lading. It was called a truck manifest. It's been referenced as a bill of lading by counsel, so that issue, articulating the truck manifest or bill of lading as the governing document has absolutely been waived. It has not been addressed in the summary judgment. While mentioned, it has not been articulated as an argument. This is a new argument, and essentially under Direct TV, Third Circuit, 2007, arguments not raised below are waived on an appeal. However, to the extent, let's assume for a moment, you ask me a question about the bill of lading, I'll answer it. The truck away bill here is not the governing document which governs the transportation transaction. Historically, when there was only a bill of lading, when you go historically into case law, there would be just a bill of lading. Here we have a freestanding transportation contract, and in that transportation contract, which the record is replete with admissions that the transportation contract applies, and that can be found at Joint Appendix 772A, page 779, where McKesson readily accepts that its rights are subject and pursuant to any contracts which Sanofi may have entered, and they go on to say that that includes two contracts, that being the transportation contract and an ancillary document called the Quality Assurance Agreement. That representation is made in Joint Appendix 1226A in plaintiff's opposition memo. Further, AXA said that in the event the court finds the so-called waiver clause is valid, with the sole remedy against GAL, is for the breach of the two contracts, and again, those two with transportation and quality agreement. But, let's say they didn't make all those admissions below, and let's say they did argue it actually below. The transportation agreement has specific language which eliminates any inconsistent language which may be included in a bill of lading. This particular trucker manifest is really, it really is a piece of paper with very limited information. Origin, destination, carrier. That's it. It didn't have liability terms. As Your Honor suggested, you would have to recreate all of the contractual terms in the bill of lading, and it would be inconsistent with practice. So, many provisions within the transportation contract eliminate application of an inconsistent bill of lading, and this one isn't even inconsistent. It doesn't say anything about liability terms. So, that hopefully addresses your question, Your Honor. Thank you. Okay, thank you. Thank you so much. Good afternoon, and may it please the court. My name is Matthew Fioravanti, and I represent Appali Pilot Travel Centers, LLC. Pilot's position is pretty straightforward. If you don't know how the theft happened, you can't prove what would have stopped it. Your Honor asked the question as to what evidence was in the record that would allow a fact finder to infer how the theft happened and then decide what would have stopped it. There is no evidence, contrary to counsel's argument. We don't know who did it. We don't know how they did it. Counsel suggested that it was done quickly. We have no idea how long this theft took. The trucker, the driver of the truck, David Rieger, went into the travel center at around 6 o'clock, came out around 7.15. So, at any point during that 75 minute period, this theft could have happened. Here's what I don't understand. So, the law down there seems to be a little confusing, right? So, generally, this would seem to be something that you'd resolve by a jury. You know, you'd put the facts in front of the jury, you know, whether they'd be plentiful or not, and they would say whether there was enough here. And, you know, there's obviously, you know, plenty of Georgia that say something like that. Why shouldn't we do that here? Do we really have to know chapter and verse how it happened in order to get this to a jury? Well, you certainly need what your Honor suggested, and that is facts. You said, put the facts before the jury and let them conclude. Georgia law says if the jury has to speculate based on whatever is before them as to what would have stopped the event from happening, that's improper, and it becomes the duty of the court to grant summary judgment. Let me ask you this question. If you have broken glass, evidence that there's clearly a break-in, it's within the property owned by your client. I mean, something went wrong, right? So, you know, the loan was not there. It was there at point A in time, and it was not there at point B in time. So there had to be some sort of breakdown in security. Isn't that sufficient evidence to put before a jury? I mean, there's nobody else to ascribe responsibility to, right? Because there's nobody, and tell me if I'm wrong about this, there's nobody else who controls the egress and ingress to the property but your client. Is that right? That is correct. But here's why you need more than just the fact that there was a theft. Truck was there one minute, now it's not. Plaintiff alleges that pilots should have implemented four specific security protocols that weren't there. One, a security guard driving around the lot. If you don't know how long the theft took to take place, and if you don't know the identity of the individual people responsible and whether they look suspicious in any way or different from any other truck driver that was there in the lot on July 9th, the jury can't conclude whether that security guard would have been alerted to something suspicious and intervened in a timely manner to stop the theft. Second thing they argue should have been implemented is access control or a gate. Well, if you don't know whether the person who stole the truck had a fake or legitimate commercial driver's license or again looked like a normal truck driver, the jury can't conclude that someone at a gate would have not noticed or saw anything out of the ordinary and that person would have driven off the lot unnoticed. Fourth thing, closed circuit TV cameras. Again, if you don't know the specific identity of the perpetrator... What you're suggesting is that there is never a set of circumstances that could be shown to prove the case against pilot because you'd never be able to do any of these things because the only thing that happens in any theft is it was there when I left it and it's not there now. Well, this is not any theft. According to the plaintiff, this is a sophisticated criminal enterprise if you assume those facts carried out by a Cuban-based organized cargo theft ring and if the FBI can't find out who did it and the GBI, the Georgia Bureau of Investigation, can't figure it out and there is no evidence at the scene other than a few pieces of broken glass and there was no CSI forensic investigation or evaluation of those alleged little pieces of evidence. There is simply, their expert says, I concur with assumptions as to who did it and I think this is how they did it. Those assumptions are absolutely meaningless because they have no basis in fact. So, to your point, this is not a scenario where, alright, something was stolen therefore we know that this would have stopped it. This is a unique type of cargo theft according to the plaintiff's complaint and there needs to be a little more sophisticated analysis as to what would have stopped this and what could pilot as the owner of the property done in order to prevent that theft from happening. Is Post Properties the case that you focus on? Post Properties is one of the several cases that talk about this body of law which says if it's simply mere speculation or the probabilities are best even as to what order would not have stopped something from happening, there is no question of fact and it becomes a duty of the court to grant summary judgment and that's what the district court correctly did in our case. Okay, thank you counsel. Here's to your talent. Thank you, your honor. I just want to bring a few points forward from my opponent's argument. The FOB origin terms, that's not unusual. It depends upon the agreements between the seller and the buyer just as CIF or any other of those terms. It depends upon the nature of the transaction. This is an interstate carriage of pharmaceuticals. So the owner of this cargo was McKesson from the get-go. The question is under the circumstances presented by the contract agreement and the right against the trucker when their cargo was stolen. And in this case we look first, okay, we know it's a Carmack to begin with. The question then becomes has that Carmack rights been properly waived? And the question is have any and all claims that Carmack provides been waived? I submit to you and the lower court I believe said in the first instance, I don't know why he said no, there is an intent to limit the rights to the signatories. So therefore, no way could this any and all claims requirement have been met. They limited the right to waive to those signatories. McKesson clearly, and my opponent has been arguing since the case began, that he wants his cake as the limitations, as the waiver, but then he doesn't want us to be entitled to bring a claim based on that contract. You know, it's like he just wants to choose which of the terms apply. Well, I believe the lower court got it right the first time saying, well, you have an intent to limit the rights to the agreement to only the signatories. Therefore, there's no way. You're not going to be foreclosed with your state contract. Well, the court did. And that's part of our appeal. The court said we had no contract with Great American Lines or MVP. And we had from the outset said, well, we got the transportation agreement. It was arranged. We were supposed to be the intended beneficiary. That's what the manifest, which is issued for each particular shipment. This was a regular run. Your adversary says you waived that. You didn't really argue that to the judge. That's not true. We raised it. The court even recognized that there was a spill of lading. We have said from the outset that we've got this bill of lading. We also thought we had the transportation agreement. We also thought we had the insurance agreement. I see my time has run out. But the thing is, the gang that we're talking about isn't based in Cuba. It's based in Florida. They call them the Cuban gang because they are well-known by the law enforcement community, particularly the top cats, I think they call themselves down in Florida, that in the southeast of the United States, this group was running rampant, stealing trucks, particularly high-value cargoes and pharmaceuticals. So that's how they knew that that was the group involved in this case. Okay. Thank you, counsel. Thank you, your honor. We'll take the case under advisement and thank counsel for their excellent written briefs and oral arguments today in this interesting case. Could the clerk at the bench please stand?